UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

SHERRY L. EASLER,                )
(Social Security No. XXX-XX-6912),    )
                                )
              Plaintiff,         )
                                )
       v.                       )        4:10-cv-12-WGH-RLY
                                )
MICHAEL J. ASTRUE,              )
COMMISSIONER OF THE SOCIAL      )
SECURITY ADMINISTRATION,        )
                                )
              Defendant.         )

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United

States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 7,

9) and an Order of Reference entered by Chief District Judge Richard L. Young

on March 23, 2010 (Docket No. 12).


## I.  Statement of the Case

Plaintiff, Sherry L. Easler, seeks judicial review of the final decision of the

agency, which found her not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under the

Social Security Act ("the Act").  42 U.S.C. §§ 416(i), 423(d), 1381; 20 C.F.R. §

404.1520(f).  This Court has jurisdiction over this action pursuant to 42 U.S.C.

§§ 405(g), 1383(c)(3).

Plaintiff applied for DIB on February 7, 2005, and for SSI on February 16, 2005, alleging disability since January 2, 2003. (R. 44, 172-74). The agency denied Plaintiff's application both initially and on reconsideration. (R. 44, 114-16, 118-22). Plaintiff appeared and testified at a hearing before Administrative Law Judge Albert Velasquez ("ALJ") on June 18, 2008. (R. 44, 480-519). Plaintiff was represented by an attorney; also testifying was a medical expert, a vocational expert ("VE"), and Plaintiff's, mother Nancy Smith. (R. 44). On July 11, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to make a successful adjustment to other work that exists in significant numbers in the national economy. (R. 44-53). After Plaintiff filed a request for review, the Appeals Council granted Plaintiff's request and remanded the case to the ALJ for further consideration. (R. 82-84). Plaintiff appeared and testified at a second hearing before ALJ Velasquez on September 3, 2009. (R. 24, 520-56). Plaintiff was represented by an attorney; also testifying was a medical expert, a VE, and Plaintiff's husband, Donald Easler. (R. 24). On September 25, 2009, the ALJ issued a second opinion finding that Plaintiff was not disabled because she retained the RFC to make a successful adjustment to other work that exists in significant numbers in the national economy. (R. 24-34). After Plaintiff filed a second request for review, the Appeals Council denied Plaintiff's request, leaving the ALJ's decision as the final decision of the Commissioner. (R. 8-10). 20

C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on January 15, 2010, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 35 years old at the time of the ALJ's decision and had at least a high school education. (R. 33, 220). Her past relevant work experience was as a warehouse stocker, inspector, forklift operator, packager, machine operator, and assembly line worker. (R. 32).

### B. Medical Evidence

#### 1. Plaintiff's Impairments

The record reflects that Plaintiff was diagnosed with cervical cancer in December 2002. (R. 349-50, 463-65). Plaintiff subsequently underwent a radical hysterectomy with pelvic lymph node dissection performed by Michael Callahan, M.D., in January 2003. (R. 460-62).

On April 25, 2003, Dr. Callahan saw Plaintiff for a post-surgical follow-up appointment. (R. 318). Plaintiff told Dr. Callahan that she had been doing well since her surgery. (R. 318). Dr. Callahan reported that there was no evidence of recurrent disease. (R. 318). A post-surgical biopsy from August 2003 was negative for malignancy and dysplasia. (R. 327).

On April 5, 2004, Plaintiff presented to Dr. Callahan for another follow-up appointment. (R. 319). Plaintiff again reported that she had been doing well. (R. 319). Dr. Callahan's physical examination revealed some light swelling in

Plaintiff's left leg, which was unchanged since after Plaintiff's surgery. (R. 319). Dr. Callahan noted that Plaintiff was instructed to use supportive measures and elevation for the swelling in her left leg. (R. 319, 323).

On May 29, 2004, Dr. Callahan's treatment note indicated that Plaintiff had a history of lymphedema. (R. 320). Dr. Callahan noted that he would recommend that she participate in physical therapy to help treat her lymphedema.[1] (R. 320).

On July 14, 2004, Plaintiff attended a follow-up gynecological appointment for her history of cervical cancer. (R. 321). Plaintiff reported that she had no complaints. (R. 321). She also reported that she had not scheduled any physical therapy for her lymphedema, noting that she was doing better at that time. (R. 321).

On December 9, 2004, Eric Fish, M.D., reported that Plaintiff's leg swelling, predominantly in her foot and ankle, had fluctuated since it first started six months after her surgery. (R. 330). Plaintiff alleged that prolonged standing or ambulation increased her swelling. (R. 330). Dr. Fish noted that Plaintiff was able to ambulate independently despite mild, soft, pitting swelling in her left foot and ankle. (R. 330). Dr. Fish diagnosed Plaintiff with mild left

---

[1]Lymphedema is a condition of localized fluid retention and tissue swelling caused by a compromised lymphatic system. Symptoms of lymphedema might include fatigue, a heavy swollen limb or localized fluid accumulation in other body areas, discoloration of the skin, and deformity. Treatments include direct lymphatic massage, compression garments and bandaging, and intermittent sequential gradient pumps. See MedLinePlus, NLM-NIH, *Lymphedema* (September 21, 2010), http://www.nlm.nih.gov/medlineplus/lymphedema.html.

lower extremity lymphedema with high potential for exacerbation. (R. 331). He recommended that Plaintiff participate in a home treatment program that consisted of daytime medical compression hose, manual lymph drainage, and nighttime compression with bandages or compression device. (R. 331). Dr. Fish noted that Plaintiff's rehabilitation potential was good. (R. 331). Within a month of starting the home treatment program, Dr. Fish reported that Plaintiff demonstrated total reduction of lymphedema in her left leg with no clinical signs of swelling. (R. 329). Dr. Fish recommended that Plaintiff continue the home treatment program on a long-term basis. (R. 329).

On February 15, 2005, Kelly Manahan, M.D., an oncologist, reported that, although Plaintiff had a history of cervical cancer, there was no evidence of recurrent disease. (R. 451). Dr. Manahan noted that Plaintiff had chronic lymphedema in her left leg, for which she had recommended physical therapy and massage. (R. 451). Dr. Manahan related that Plaintiff had reported that the physical therapy and massage were helping. (R. 451).

On April 13, 2005, Richard Karkut, Ph.D., a clinical psychologist, conducted a consultative mental status examination on Plaintiff. (R. 259-62). Plaintiff alleged that she was disabled due to depression, cervical cancer, and lymphedema. (R. 259). Plaintiff claimed that she became disabled after being diagnosed with cervical cancer in December 2002. (R. 261). She alleged that she had been having problems with sleep and appetite for the past three years, along with problems concentrating, depressed mood, anhedonia, feelings of

hopelessness, and fatigue.  (R. 262).  Plaintiff reported that these symptoms

remain present despite a history of mental health treatment, but she was not

currently taking any anti-depressant medication.  (R. 262).  Plaintiff stated that

her activities of daily living included watching television, playing on the

computer and internet, washing dishes, and doing laundry.  (R. 261).  Dr.

Karkut noted that Plaintiff's abstract reasoning, similarities, immediate and

recent memory, judgment, and general fund of information were adequate.  (R.

259-60).  Dr. Karkut diagnosed Plaintiff with Major Depressive Disorder, Single

Episode, Moderate.  (R. 262).  Dr. Karkut assessed a Global Assessment of

Functioning ("GAF") score of 55 at the current time and 60 as the highest in the

past year.[2]  (R. 262).

On May 12, 2005, Mehmet Akaydin, M.D., conducted a consultative

physical examination on Plaintiff.  (R. 237-42).  Plaintiff reported that her main

problem was lymphedema in her left leg, which she alleged had been hard to

control since the summer of 2003.  (R. 237).  She also alleged that she had a

little carpal tunnel in her left hand and some migraine headaches.  (R. 237).

Plaintiff denied having any severe musculoskeletal discomfort of any kind.  (R.

237).  Dr. Akaydin reported that Plaintiff was in no acute distress, was alert and

oriented, and had a very bright affect with extremely amiable and personable

mannerisms throughout the examination.  (R. 238).  Upon physical examination,

---

[2]A GAF score of 51-60 indicates that Plaintiff had moderate symptoms or
moderate impairment in social and occupational functioning over the past year.

Dr. Akaydin noted that Plaintiff's upper and lower extremities were extremely healthy in overall appearance, but that she had some diffuse swelling throughout her left foot and calf region and that the left leg and foot were somewhat warmer to the touch than the right. (R. 239, 241). Dr. Akaydin reported that Plaintiff's muscle strength, muscle tone and bulk, range of motion, and sensation were normal for all extremities. (R. 239-40). Plaintiff's station and gait were essentially totally normal without the need of any assistive devices, with findings of "quite good overall speed, stability, and sustainability". (R. 240). Plaintiff was able to get on and off the examination table by herself without any overt difficulty or discomfort. (R. 240). Plaintiff was also able to tandem, toe and heel walk quite well, all performed somewhat slowly and deliberately, and was able to squat half way down and raise back up under her own power while holding onto the examination table. (R. 240). Plaintiff was able to pick up coins, grasp objects of various sizes, button and unbutton articles of clothing, and open and close the exam room door without any difficulty whatsoever. (R. 240). Based on his examination findings, Dr. Akaydin stated that Plaintiff appeared to be essentially fully intact in a gross general cognitive, physical, neurological, and orthopedic sense at the time of the examination without any overt potential limiting deficits of any kind being readily appreciated. (R. 241). He stated that Plaintiff had essentially fully intact upper and lower extremity function bilaterally with very good/excellent grip strength and fine motor function in both hands, that she was fully ambulatory without the need of any assistive devices,

and that she had essentially a full range of motion in all joints. (R. 241). Dr. Akaydin opined that Plaintiff should be capable of performing most forms of at least mildly to moderately physically strenuous employment without any overt difficulty as long as she was given the appropriate clearance from her treating physicians and followed all of the functional restrictions closely. (R. 241). Dr. Akaydin opined that Plaintiff would be best suited for those jobs that are of a relatively sedentary nature where she could keep her left leg elevated as much as possible with only minimal to occasional standing, walking, and stair climbing required. (R. 241).

On August 8, 2005, Robert MacWilliams, M.D., conducted a limited medical examination. (R. 234-35). Dr. MacWilliams reported that Plaintiff's gait was ataxic and, at other times, she just shuffled; however, she was relatively stable. (R. 234). He noted that she tended to favor the left leg when limping. (R. 234). Dr. MacWilliams reported that Plaintiff's range of motion of both lower extremities was within normal limits in spite of the lymphedema. (R. 234). He noted that Plaintiff's muscle strength, muscle tone and bulk, sensation, and reflexes were normal. (R. 234).

On January 18, 2007, pap smear testing indicated that Plaintiff was negative for malignancy. (R. 379).

On March 28, 2007, a pathology report again indicated that Plaintiff was negative for lesion or malignancy. (R. 403-04).

On November 11, 2007, a pathology report again indicated that Plaintiff was negative for lesion or malignancy. (R. 420).

On June 18, 2008, Julian Freeman, M.D., a medical expert physician who specialized in internal medicine and urology, testified at Plaintiff's first administrative hearing. (R. 500-04). Dr. Freeman opined that Plaintiff did not meet or equal a listed impairment. (R. 500-01). Dr. Freeman opined that Plaintiff could perform medium work with no significant limitations in postural activities. (R. 501). Dr. Freeman testified that the evidence raised the possibility that Plaintiff might be limited to less than six hours of walking and standing a day and as little as four hours of walking and standing per day, depending on the severity of the swelling in her leg. (R. 501). Dr. Freeman testified that, whereas the objective medical evidence indicated that Plaintiff's swelling was mild, Plaintiff had alleged that her swelling was fairly severe. (R. 501). He stated that, if Plaintiff's allegations about her swelling were found to be credible, then the swelling and associated discomfort might conceivably limit her to four hours of walking and standing a day in divided periods of up to about 10 or 15 minutes each. (R. 501). Dr. Freeman further testified that, although Plaintiff had alleged experiencing migraine headaches at her consultative mental examination, the medical evidence of record did not indicate how frequently Plaintiff experienced these headaches. (R. 501-02). Dr. Freeman testified that it appeared as if Plaintiff's depression was the main problem that was present, because there was no physical impairment present that would limit her to less than sedentary

activities. (R. 502, 504). However, Dr. Freemen testified that the medical records did not provide any clear insight into how severe Plaintiff's depression actually was. (R. 502).

On June 17, 2009, an MRI of Plaintiff's lumbar spine revealed minor degenerative disc disease at L5-S1, but otherwise no abnormalities were noted. (R. 473). The MRI did not reveal any evidence of significant disc bulge, disc herniation, or central canal stenosis. (R. 473).

On July 6, 2009, Robert Buell, M.D., a neurologist, performed an EMG and nerve conduction studies, which were only mildly abnormal. (R. 476-77). Dr. Buell reported that, although the studies suggested mild chronic or old left L5 radiculopathy, there was no evidence of acute or active denervation. (R. 477). Dr. Buell noted that there was no evidence of acute lumbosacral radiculopathy, acute lumbosacral plexopathy, or peripheral neuropathy. (R. 477).

On September 1, 2009, Plaintiff underwent a work evaluation study performed by physical therapists at Schneck Medical Center Rehab Services. (R. 36-40). Plaintiff reported that she was able to drive or ride in a car for 45 minutes before she needed to stop and get out of the car to stretch. (R. 37). She also reported that she could walk for about one hour at a mall, fair, or event. (R. 37). Plaintiff reported that, in a 24-hour day, she usually sat for four hours, stood for eight hours, and reclined/laid down for 12 hours. (R. 37). During the functional capacity evaluation, Plaintiff was able to lift 16-21 pounds in a variety of different lifting exercises. (R. 37). The physical therapists indicated that

Plaintiff ambulated independently with an antalgic gait. (R. 38). They noted that Plaintiff's strength in her extremities was normal or near normal and that her range of motion in her extremities was within normal limits. (R. 39). The physical therapists opined that Plaintiff would be able to perform light work that allowed her to transition frequently between sit to stand and walking. (R. 39). The physical therapists stated that Plaintiff's lymphedema could be managed with some type of compression during the day. (R. 39). However, the physical therapists noted that, although Plaintiff wore her compression bandages at night, Plaintiff claimed that she was unable to tolerate the compression hose during the day. (R. 39). The physical therapists opined that, if Plaintiff was truly unable to tolerate the compression hose during the day, she would need to be able to freely elevate her left leg above the heart throughout the workday. (R. 39-40).

On September 17, 2009, Anne McGriff, M.D., composed a letter stating that she was unable to provide a formal functional capacity assessment for Plaintiff. (R. 563). Instead of providing an opinion on Plaintiff's residual functional capacity, Dr. McGriff summarized the recent medical evidence including the June 2009 MRI of Plaintiff's lower back, the July 2009 EMG studies, and the September 2009 work evaluation study from Schneck Medical Center Rehab Services. (R. 563). Dr. McGriff opined that with the required elevation of the left leg Plaintiff would not be able to sustain work activity at any exertional level, and without being able to elevate the leg would be at an

increased risk for more severe lymphedema and possibly vascular problems in the future. (R. 563).

On September 3, 2009, Paul Boyce, M.D., a medical expert, testified at Plaintiff's second administrative hearing. (R. 536-47). Dr. Boyce testified that Plaintiff did not meet or equal a listed impairment. (R. 539-40). Dr. Boyce further testified that he agreed with the state agency reviewing opinion, which stated that Plaintiff was capable of performing a range of light work. (R. 545). Dr. Boyce stated that he would further limit Plaintiff to jobs that allowed for a sit/stand option that would allow Plaintiff to alternate positions at her option for up to five minutes per hour. (R. 546). Dr. Boyce also testified that Plaintiff should avoid extremes of high temperatures and high humidity. (R. 546). Upon cross-examination, Plaintiff's attorney asked Dr. Boyce about the appropriate means of dealing with lower extremity swelling. (R. 540). Dr. Boyce testified that it is generally recommended that individuals with swelling in their lower extremities wear measured, compression hose during the day. (R. 540). Dr. Boyce stated that, in Plaintiff's case, a mid-thigh compression hose would have been adequate to treat Plaintiff's swelling in her lower extremities. (R. 540). Dr. Boyce further testified that it is generally recommended that individuals with lower extremity swelling elevate their legs periodically throughout the day, depending on the severity of the swelling. (R. 540). However, Dr. Boyce testified that the medical evidence of record did not indicate that Plaintiff's swelling was severe enough to require elevation throughout the workday. (R. 541). Dr. Boyce

also noted that new studies had indicated that increased activity and walking were preferable to elevation of the extremity because it promoted better blood flow and reduced the severity of the swelling.  (R. 541).

## 2.  State Agency Review

On April 22, 2005, J. Gange, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique form.  (R. 245-58).  Dr. Gange opined that Plaintiff did not have a severe mental impairment.  (R. 245, 257).  Dr. Gange opined that Plaintiff's judgment and general fund of information were adequate.  (R. 257).  He opined that Plaintiff had only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace with no episodes of decompensation.  (R. 255).

On September 12, 2005, L. Bastnagel, M.D., a state agency reviewing physician, completed a Physical Residual Functional Capacity Assessment form.  (R. 225-33).  Dr. Bastnagel opined that Plaintiff could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (R. 226).  He opined that Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and could frequently balance.  (R. 227).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in

order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.

The ALJ must consider whether the claimant:  (1) is presently employed; (2) has

a severe impairment or combination of impairments; (3) has an impairment that

meets or equals an impairment listed in the regulations as being so severe as to

preclude substantial gainful activity; (4) is unable to perform her past relevant

work; and (5) is unable to perform any other work existing in significant

numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the

burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.

2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful

activity since the alleged onset date and that Plaintiff was insured for DIB

through December 31, 2006.  (R. 26).  The ALJ continued by finding that, in

accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are

classified as severe:  obesity and lymphedema of both lower extremities.  (R. 27).

The ALJ concluded that none of these impairments or combination of

impairments met or medically equaled any of the listings in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (R. 29).  The ALJ determined that Plaintiff's testimony

was not fully credible.  (R. 31).  The ALJ then found that Plaintiff retained the

following RFC:  lift and/or carry 20 pounds occasionally and 10 pounds

frequently; stand and/or walk for six hours in an eight-hour workday; sit for six

hours in an eight-hour workday; occasionally stoop, kneel, crouch, crawl, or climb stairs/ramps; never climb ladders, ropes, or scaffolds; and could frequently balance. Plaintiff should avoid: moderate work around unprotected heights; dangerous or moving machinery; operating a motor vehicle; or work around open flames or large bodies of water due to possible side effects of medication and distraction caused by pain and fatigue. Plaintiff is also unable to perform work which subjects her to high heat or humidity. Plaintiff must be able to alternate from a sitting to a standing position at her option for approximately five minutes per hour at her workstation. (R. 30-31). The ALJ determined that, based on this RFC, Plaintiff could not perform her past work, but could still perform a significant number of jobs in the national economy, including jobs as a mail clerk, office machine operator, electronic assembly, account clerk, callout investigator, and semiconductor manufacturing. (R. 33). The ALJ, therefore, concluded that Plaintiff was not under a disability. (R. 34).

## VI. Issues

Plaintiff has raised seven issues. The issues are as follows:

1. Whether the ALJ failed to include any limitation for depression in his RFC assessment.

2. Whether the ALJ ignored significant medical evidence.

3. Whether the ALJ improperly declined to add a sit/stand option to Plaintiff's RFC.

4. Whether Plaintiff's RFC should have included a need to elevate her leg.

5. Whether the ALJ improperly rejected third party testimony.

6. Whether the ALJ's credibility determination was patently wrong.

7. Whether the ALJ asked proper hypothetical questions of the VE.

**Issue 1:     Whether the ALJ failed to include any limitation for depression in his RFC assessment.**

Plaintiff first argues that the ALJ failed to include any limitation for her depression in his RFC assessment. However, Plaintiff did not present any substantial medical evidence that supports her allegation that her depression required a functional limitation to be included in her RFC. Dr. J. Gange, the state agency reviewing psychologist, opined that Plaintiff did not have a severe mental impairment. (R. 245, 257). Dr. Gange opined that Plaintiff's mental impairment caused no more than a "mild" limitation on daily activities and, with no episodes of decompensation, Plaintiff did not suffer from a severe mental impairment. (R. 255, 257). Furthermore, Plaintiff testified during her second hearing that she was not participating in any individual or group counseling for her depression. (R. 553). Plaintiff relies on Dr. Julian Freeman, the medical expert who testified at the first hearing, that depression was the Plaintiff's "main problem." (R. 502). However, Dr. Freeman opined that the medical evidence did not provide any insight into the severity of Plaintiff's depression. (R. 502).

Plaintiff also argues that the ALJ erred when he found mild depression because plaintiff's GAF score of 55, and a high of 60 in the past year, indicated moderate or severe depression. However, "nowhere do the Social Security

regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Wilkins v. Barnhart,* 69 Fed.Appx. 775, 780 (7th Cir. 2003). Plaintiff argues that her GAF score indicates that she has moderate to severe depression. However, Dr. Richard Karkut, a clinical psychologist who performed a consultative mental examination on Plaintiff, did not suggest any significant work-related limitations. (R. 259-62). Therefore, given that no medical evidence provided any clear insight into the severity of Plaintiff's depression, the ALJ's decision is affirmed.

**Issue 2:      Whether the ALJ ignored significant medical evidence.**

Plaintiff argues that the ALJ ignored significant medical evidence. The ALJ is not required to discuss every piece of evidence in the record, but is instead required to build a logical bridge from the evidence to his conclusions. *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir. 2009).

The ALJ did not ignore significant medical evidence, but instead addresses each claim throughout his determination and builds a logical bridge from the evidence to his conclusions. The results of the MRI of the lumbar spine, the EMG study, and the report from Schneck Medical Center Rehab Services are all discussed at some point in the ALJ's findings. (R. 27-30). The findings of the ALJ are consistent with the medical evidence of record.

**Issue 3:      Whether the ALJ improperly declined to add a sit/stand option to Plaintiff's RFC.**

Plaintiff argues that the ALJ improperly declined to add a sit/stand option to Plaintiff's RFC. However, the ALJ discusses in his assessment the need for

the Plaintiff to be allowed to alternate from a sitting to a standing position at her option. (R. 32). The ALJ found the RFC conducted by Dr. Boyce was supported by his testimony and the assessment that was contained in the record. This determination is supported by substantial evidence. The Court specifically notes that the sit/stand option recommendation provided by Schneck Medical Center Rehab Services on September 1, 2009, was in reference to Plaintiff's complaint of back pain. (R. 39). The ALJ found that Plaintiff's alleged back impairment was not documented in the medical evidence as causing Plaintiff to have limitations and restrictions. Given this evidence, and that the ALJ did indeed discuss the need for a sit/stand option, the ALJ's decision is affirmed.

**Issue 4:       Whether Plaintiff's RFC should have included a need to elevate her leg.**

Plaintiff argues that her RFC assessment should have included a need to elevate her leg. The ALJ did not specifically address Plaintiff's need to elevate her leg. However, evidence and testimony show that the elevation of the leg above heart height was not required. Dr. Boyce testified that elevation is commonly recommended for individuals with severe edema. Dr. Boyce opined that Plaintiff's edema did not appear to be severe enough to require elevation of the leg throughout the work day. (R. 541). Dr. Boyce recommended that Plaintiff's edema could be helped by elevation of the leg in the evening after Plaintiff had been on her feet during the course of the day. (R. 541). The physical therapists opined that Plaintiff had to be able to freely elevate her lower leg above the heart throughout the day, but the lymphedema could be managed

with some type of compression during the day. (R. 39-40). Plaintiff alleges that she is not able to tolerate the compression hose during the day. However, medical evidence indicates that the lymphedema was being helped with home treatment consisting of daily compression hose, use of compression bandages at night, and manual lymph drainage. (R. 329). Dr. Fish opined that less than a month after Plaintiff complained of edema in her lower leg, there were no clinical signs of edema present after Plaintiff had begun home treatment. (R. 329). Plaintiff points to a letter written by Dr. McGriff on September 17, 2009, in which she opined that Plaintiff would not be able to sustain work activity at any exertional level without being able to elevate her leg. (R. 563). However, Dr. McGriff declined to perform a formal functional capacity assessment on Plaintiff and based her opinion solely on three pieces of medical evidence. The ALJ is not obligated to adopt this assessment, as Dr. McGriff's opinion is not supported by objective medical evidence and is contradicted by other substantial objective medical evidence in the record. Given the substantial evidence in the record to support the RFC, the Court concludes that the ALJ's decision must be affirmed.

**Issue 5:      Whether the ALJ improperly rejected third party testimony.**

Plaintiff argues that the ALJ improperly rejected the third party testimony of Plaintiff's husband and mother. (R. 529-32, 504-11). However, the ALJ did not err by declining to specifically address a third party's testimony when that evidence "was essentially redundant" of the Plaintiff's allegations and did not

constitute a separate "line of evidence." *Books v. Chater,* 91 F.3d 972, 980 (7th Cir. 1996).

The testimony given by Plaintiff's husband and mother was essentially the same testimony given by the Plaintiff and did not provide new evidence for the ALJ to consider. Both Plaintiff's husband and mother testified to the amount of pain the Plaintiff appeared to be in. (R. 530-31, 505-06). The Plaintiff's mother testified as to the depression suffered by Plaintiff and the types of activities that Plaintiff no longer can participate in as a result of her depression, such as playing with her children, gardening, and shopping. (R. 506-09). However, Plaintiff had already testified regarding the amount of pain she was in and the effects her depression had on her daily activities. (R. 487-92). Therefore, the testimony given by Plaintiff's husband and mother was essentially redundant, and the ALJ did not err by declining to specifically address the third party testimony.

**Issue 6: Whether the ALJ's credibility determination was patently wrong.**

Plaintiff argues that the ALJ conducted a flawed credibility determination. An ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000). However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain. Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in

when determining an individual's credibility:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be

accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms – such as pain – are considered, several factors are relevant, including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The ALJ's assessment of Plaintiff's credibility can be found at pages 31-32 of the Record and was as follows:

The claimant has indicated that she is not able to stand or sit for more than a couple of hours, after which her legs start to swell even when she is wearing hose. She also reported that once her legs start to swell, it is very difficult for her to function and that even walking is painful. The claimant has also reported that pain and swelling in her legs prevent her from doing almost everything (Ex. 1E at 36).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible, to the extent they are inconsistent with the above residual functional capacity assessment.

On April 15, 2005, Dr. Mehmet Akaydin reported that "...she should be quite capable of performing most forms of at least mildly to moderately physically strenuous employment without any overt difficulty..." (Ex. 1F at 13). A report from the Rehabilitation Services dated September 1, 2009, indicates that although the claimant complained of "burning in her left leg especially in her lower leg and foot caused by lymphedema" she was able to occasionally lift from the floor and carry overheard and otherwise up to 16 pounds. Dr. L. Bastnagel completed a Physical Residual Function Capacity Assessment dated September 12, 2005, indicating that the claimant is able to occasionally lift and or carry up to 20 pounds; frequently able to lift and or carry up to 10 pounds; stand and or walk about six hours during an eight hour workday and sit for about six hours during an eight hour workday (Ex. 1F at 2). Furthermore, Dr. Paul A. Boyce who is the medical expert who testified at the hearing, stated that he agreed with the residual function capacity assessment contained in the record (Ex. 1F) with the two additional limitations of not being able to work around extreme heat or humidity and provided the claimant was allowed to alternate from a sitting to a standing position at her option. The medical opinions throughout the record consistently indicate that the claimant is exertionally capable of performing much more than what she has alleged are her limitations and restrictions. Accordingly, the undersigned finds the claimant's testimony at the hearing to be only partially credible.

(R. 31-32). While this was not a perfect credibility determination, it was clearly

not patently wrong. The ALJ looked at the objective medical evidence as well as

several other factors and reasonably concluded that Plaintiff's complaint's of pain were not fully credible. While the ALJ did not discuss every piece of medical evidence, the Court notes that within a month of starting the home treatment program for her lymphedema, which included daytime medical compression hose, manual lymph drainage, and nighttime compression with bandages or compression device, Plaintiff demonstrated a total reduction of lymphedema in her left leg with no clinical signs of swelling. (R. 329). The Court also takes note that Plaintiff reported that physical therapy and massage were helping with the lymphedema. (R. 451). The opinions of Dr. Akaydin (R. 241), Dr. Bastnagel (R. 225-33), Dr. Freeman (R. 501-02), Dr. Boyce (R. 545-46), and the Schneck Medical Center physical therapists (R. 39-40) generally indicated that Plaintiff was capable of performing light work. (R. 31-32).

The ALJ noted that Plaintiff's daily activities included watching television, driving, reading, housecleaning, going to the grocery store, playing on the computer and internet, washing dishes, and doing laundry. (R. 261). The ALJ found that there were some limitations to Plaintiff's daily activities, but those limitations were only mild. (R. 28). The Court concludes that this assessment of Plaintiff's credibility was not patently wrong, and the decision of the ALJ must be affirmed.

**Issue 7:    Whether the ALJ asked proper hypothetical questions of the VE.**

Finally, Plaintiff argues that the ALJ committed error by failing to include Plaintiff's depression, elevation of the lower left leg above heart height, and a

sit/stand option in his hypothetical questions to the VE. It is true that hypothetical questions "posed by the ALJ to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir. 1994). For the reasons stated in Issue 1, the ALJ did not find sufficient medical evidence that Plaintiff's depression constituted a severe mental impairment; therefore, the ALJ is not required to include depression in his hypothetical questions of the VE.

Plaintiff argues that the ALJ failed to include the need for elevation of the lower leg above heart height throughout the work day. Again, for the reasons stated above, the ALJ did not find sufficient medical evidence that Plaintiff needed to elevate her leg above heart height throughout the workday; therefore, the ALJ is not required to include this restriction in his hypothetical questions of the VE.

Finally, Plaintiff argues that the ALJ failed to include a sit/stand option in his hypothetical questions of the VE. However, the record indicates that the ALJ did give a hypothetical question that included a sit/stand option for about five minutes per hour, and the VE opined that there were jobs available with that limitation. (R. 547-48).

The Court concludes that the ALJ did not err in failing to ask proper hypothetical questions of the VE. Therefore, the decision of the ALJ is affirmed.

## VII. Conclusion

The ALJ's decision is supported by substantial evidence. The ALJ reasonably considered Plaintiff's allegation of depression. The ALJ conducted a thorough examination of all significant medical evidence. The ALJ's RFC assessment, including the sit/stand option and a need for Plaintiff to elevate her lower leg, is supported by substantial evidence. The ALJ was not obligated to accept the statements of Plaintiff's husband or mother. The ALJ conducted a thorough credibility determination that was not patently wrong. Finally, the ALJ asked proper hypothetical questions of the VE that incorporated all of Plaintiff's impairments. The decision of the Commissioner of the Social Security Administration is **AFFIRMED.**

**SO ORDERED.**

**Dated:** December 14, 2010

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**Electronic copies to:**

Steven K. Robison
MONTGOMERY ELSNER & PARDIECK
srobison@meplegal.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov